COSENTINO, Regional Director, v. DISTRICT COUNCIL OF PORTS OF PUERTO RICO, International Longshoremen's Ass'n, A. F. L., et al.

Civ. No. 6866.

United States District Court
D. Puerto Rico, San Juan Division.
Sept. 30, 1952.

Harley A. Miller, U. S. Atty., San Juan, Puerto Rico, David P. Findling, Winthrop A. Johns, Washington, D. C., George L.

---

13. United States v. Pierce, 8 Cir., 137 F. 2d 428.

14. Blair v. Commissioner, 300 U.S. 5, 13, 57 S.Ct. 330, 81 L.Ed. 465.

Weasler, San Juan, Puerto Rico, and James F. Foley, Washington, D. C., for petitioner.

Hipolito Marcano and Ramon H. Vargas, San Juan, Puerto Rico, for respondents.

RUIZ–NAZARIO, District Judge.

This case is before the court on the petition of the Regional Director of the Twenty-Fourth Region of the National Labor Relations Board praying for injunctive relief, pending final determination by the Board, of the question whether respondents have or have not engaged in unfair labor practices within the meaning of Section 8 (b) (4) (A), (4) (C), and (4) (D) of the Act, 29 U.S.C.A. § 158(b) (4) (A, C, D), affecting commerce within the meaning of Section 2(6) and (7) of the Act, 29 U.S.C.A. § 152(6, 7).

At the outset it must be pointed out that the relief contemplated and prayed for in the petition is in the nature of an interlocutory injunction, as the final determination of the truth of the charges and the existence of a violation of the Act affecting commerce devolves upon the Board, subject to review by a Court of Appeals. Douds v. Local 1250, Retail Wholesale Dept. Store Union, 2 Cir., 170 F.2d 695. However, the situation unfolded during the trial by an overwhelming preponderance of the evidence, is so serious for the economic life of Puerto Rico, and indeed affecting as it does the very preservation of its economic life, that the Court is compelled to go beyond a mere finding of reasonable cause to believe that a violation of the Act has occurred and that equitable relief is just and proper.

It is unnecessary to recapitulate, in this opinion, the facts of the attempt at industrial dictatorship particularized in the Findings of Fact. It is nevertheless necessary, in order that all concerned may appreciate the meaning of these facts, and grasp their significance, that the court make a few observations which have no place in the formal items of Findings of Fact, or the dry verbiage of an interlocutory injunction.

█ Respondent Moreno is president of respondent ILA, and is also representative in Puerto Rico of the International Longshoremen's Association, AFL. ILA is an organization which is composed of affiliated locals like respondents Locals 1740 and 1674, which represent employees who are employed in stevedoring and longshoremen's work in and about the Port of San Juan, stevedores and longshoremen working in other island ports being also members of other ILA affiliated locals. Trades Council is affiliated with International Longshoremen's Association, and does business with the latter through respondent Moreno, the latter's representative in Puerto Rico. Anomalously, Trades Council represents local agricultural and factory workers employed in Puerto Rico. There is, of course, nothing sinister about all this, although it is rather difficult for the average person to find any similarity between the labor problems confronting longshoremen and those affecting agricultural workers. The situation only becomes sinister in view of the geographical fact that Puerto Rico is an island, dependent on ILA's men, under Moreno's leadership, for the loading and unloading of the ships without which our entire economy would shrivel up and die. The record in this case shows, beyond all doubt, that Moreno is well aware of the possibilities of the local situation, and this court takes notice of respondents Moreno's and ILA's behaviour in previous controversies of similar nature of which this court had cognizance in the past year. The affaire Roig here, is merely another attempt in the same direction. In labor wars on an island, control of the sea is as vital as in a war between nations, and respondents ILA and its affiliates, under respondent Moreno's local leadership, have it in Puerto Rico. Without their acquiescence, ships do not sail, or if they do, they sail unladen.

The most recent attempt to take advantage of this local situation was being reviewed by the Supreme Court of Puerto Rico while the hearings in this case were in progress. It was, precisely, with reference to the action then pending before the highest court of the Commonwealth of Puerto Rico, that respondent Moreno used in his cable dated May 21, 1952, addressed to W. E. Townsend, Vice-President of ILA then attending the South Atlantic and Gulf Dis-

trict Convention at Galveston, Texas (Exh. 3 Petit.) the following language:

"Insular Labor Board trying to impose dictatorial law through P. R. Supreme Court to compel us to load ships with slave salary handled hot cargo. We appeal to your convention help P. R. ILA members declare embargo in the continent on this companies (sic) sugar product if by court order we are forced to handle it."

What the Supreme Court of the Commonwealth of Puerto Rico found in said case is at odds with respondent Moreno's said charge. Its illuminating language will be found very valuable in this connection, and this court has taken the liberty of translating, freely, the following excerpts from the opinion therein:

"This case invites one to meditate much further than the bare limits of its issue: in the magnificent virtues of democracy, which have made it great, and in the *weaknesses* and *intolerance* of those enjoying it by which it may be endangered.

"In the inevitable disputes which arise between capital and labor, in the course of their relations, both sides at times seems to forget, in the exercise of their respective rights—which exist so long as the democratic heritage and the integrity of the State recognizing them are preserved—the moral and patriotic duty of finding a prompt solution to their controversies, to avoid *affecting* the *economy* and the *security* of the system *which gives* life to those rights and prevent forces from within or from *without taking advantage* of the vital function of democracy to undermine its foundations and try to get it ·to defeat itself.

"This case furnishes—within the lifeless dryness of a judicial proceeding—another example of the legitimate effort of a people struggling against want and poverty, produced by the imbalance between its continuous increase in population and its scanty resources, in its desperate determination to improve its health and its standard of living through the maximum development of its limited economic potentialities, for which industrial peace, in all phases of productive activity, is an indispensable factor, with its *highest expression of stability*—because this is an Island—on the *maritime fronts*.

\*　\*　\*　\*　\*　\*

"Under any circumstance, the right secured by Section 301(a) was conferred to the contracting parties; and it cannot be inferred, from the text thereof, nor from its legislative history, that it was intended to deprive states or territories from exercising the power to regulate the contemptuous conduct of the parties to said agreement, when such conduct *endangers* the *very life of the community* because of its *injurious effect* on the *basic structure of its economy*, considering all the factors of which it is composed and by which it is affected." Labor Relations Board of Puerto Rico, Petitioner v. International Longshoremen Association (ILA), District Council of Ports of Puerto Rico and its President Rusebio P. Moreno, et als. No. 36 DPR — decided July 23, 1952. (Emphasis supplied.)

The certified union at Central El Ejemplo was invaded by ILA's men, who presided over an irregular meeting. A sham election of new officers was made, without a quorum therefor, and upon the employers' refusal to deal with these so-called new officers, ILA's men, following Moreno's instructions, prevented the unloading of Roig's refined sugar. The contention that the picket line was established because ILA's men, and not the truckers' men were entitled to do this work, is absurd. Refined sugar, as well as other general cargo, has always been unloaded by employees of the inland carrier, with the exception of the war years, when, for security reasons, the longshoremen were employed in this work. The interference with the unloading of Roig's refined sugar, then being done by the truckers' men, was nothing but pressure brought to compel recognition of the so-called officers allegedly elected at the unauthorized meeting of the certified union at

El Ejemplo. Success in this endeavor would have put respondents ILA and its locals, through Trades Council, all under the dominance of respondent Moreno, in a position of absolute control of labor organization throughout the island, and would make a farce of the law of the land. As one of his men intimated, Moreno would be above the law. No industry, no enterprise, could bargain and deal with any but Moreno's dominated unions, no matter whether a majority of the workers employed in the particular industry lawfully chose another union as its agent or representative, for, of what profit would it be, to manufacture and produce, if, by the capricious or contemptuous conduct of such self elected ruler of the waterfront, the goods were left to rot in the warehouse?

To tolerate respondents' said conduct against other laborers and bona fide labor organizations and to the detriment of business and industry, would, as stated by the cited decision of the highest court of the Commonwealth of Puerto Rico "endanger the very life of the community, because of its injurious effect on the basic structure of its economy", by arbitrarily shutting off all business "on the maritime fronts", which is the "highest expression of stability" among the "indispensable factors of productive activity" of this community.

It is deplorable that labor and respectable labor organizations who have always had, and will continue to enjoy, the utmost recognition and fairest treatment and protection from this court, whenever their rights are the subject of honest dispute, be unconsciously made the instruments for satisfying personal ambitions of domination and power by an individual, who as their mere agent and servant, owes complete subordination to the sacred interests of labor, and lend themselves to assail the rights of other brother laborers, not affiliated to them, to select representatives of their own choosing and become members of whatever union they prefer, without any interference whatsoever, either from capital or from any other laborers or labor organizations, which are sought to be protected in this proceeding.

It is an understatement, in the light of the testimony and exhibits, and the construction given by the courts to the statutory provisions here in question, to state that there is reasonable cause to believe that respondents have engaged in unfair labor practices; and it is wholly just and proper, to grant the equitable relief prayed for by petitioners.

Though the court concedes that, in controversies of this nature, what ordinarily counts is the end achieved, rather than the means employed or any side results thereof, these here, as disclosed by the cited opinion of the Supreme Court of the Commonwealth of Puerto Rico and by the factual situation above discussed, appear to be so serious, as to justify the conclusion that respondent Moreno, conscious of their destructive effect to the economy of Puerto Rico and to the very life of its peoples and, principally, of the feeling of fear that his repeated threats thereto have created in the whole community, is, and has been, capitalizing on this fear to get away with his purpose of achieving an end evidently unlawful, said means and side results notwithstanding. This Court would not be performing its duty if it did not express its utmost reprobation of said conduct.

It must be added that the court, in handing down this opinion, has not lost sight of the fact that it is exercising here, mere interlocutory powers necessary to restore or preserve the status quo pending final adjudication by the National Labor Relations Board of the unfair labor practices complained of, and "to protect the public welfare which is inextricably involved in labor disputes." See: S.Rep.No. 105, 80th Cong. 1st Sess. p. 8. Therefore, the court, by expressing its views herein, does not intend to invade the powers and jurisdiction of the Board in its final appreciation of the problem in any form or manner whatsoever.

Findings of Facts and Conclusions of Law are being made and a Decree rendered, accordingly.

### Decree

This cause came on to be heard upon the verified petition of Salvatore Cosentino,

Regional Director of the Twenty-Fourth Region of the National Labor Relations Board, on behalf of the Board, pursuant to Section 10(*l*) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 160(*l*), for a temporary injunction pending final adjudication by the National Labor Relations Board of the matters involved, and upon an order to show cause why injunctive relief as prayed should not be granted. Upon consideration of the petition, answer, testimony, evidence and petitioner's brief, respondents having failed to file any, the Court has rendered its decision and duly made and entered its findings of fact and conclusions of law, and it appearing to the satisfaction of the Court that there is reasonable cause to believe that respondents have engaged in acts and conduct in violation of Section 8(b), Title 29 U.S.C.A. § 158(b) (4) (A, C, D), subsections (4) (A), (4) (C), and (4) (D) of the Act as alleged in the petition, and that such acts and conduct affect commerce within the meaning of Section 2, Title 29 U.S.C.A. § 152, (6, 7), subsections (6) and (7) of the Act,

It is, therefore, by this Court,

Ordered, Adjudged and Decreed that respondent District Council of Ports of Puerto Rico, International Longshoremen's Association (ILA–AFL), herein called ILA, and respondents Locals 1740 and 1674 and their officers, agents, servants, employees, and attorneys and respondent E. G. Moreno, his agents, servants, employees, and attorneys and all persons in active concert or participation with them be and they hereby are, *Enjoined* and *Restrained* pending the final adjudication by the National Labor Relations Board of the matters involved in this proceeding from engaging in or by picketing, threats, orders, directions, appeals, requests, instructions, or any other means, or permitting such to remain in effect, inducing or encouraging employees of Francisco Vega Otero, herein called Vega Otero, Lykes Lines Agency, Inc., herein called Lykes Lines, Bull Insular Lines, Inc., herein called Bull Lines, the latter's wholly owned subsidiaries, or of any other employer, to engage in a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials or commodities, or to perform services, where an object thereof is: (1) To force or require Vega Otero, Lykes Lines, Bull Lines, the latter's wholly owned subsidiaries, or any other employer, to cease using, selling, handling, transporting or otherwise dealing in the products of Antonio Roig Sucrs. S. en C., Central Roig Refining Company, Inc., or any other producer, processor, or manufacturer or to cease doing business with Antonio Roig Sucrs. S. en C., Central Roig Refining Company, Inc., or with any other person; or (2) to force or require Antonio Roig Sucrs. S. en C. or Central Roig Refining Company, Inc. to recognize or bargain with respondent, a union of industrial workers of Central El Ejemplo, organized by and under the leadership of Juan Rodriguez Rojas and others, herein called Rodriguez Rojas' Union, or respondent Amalgamated Trade Unions' Council (ILA–AFL), herein called Trade Council, as the collective bargaining agent of employees of Central El Ejemplo, Humacao, Puerto Rico, as long as the Organization of Industrial Workers of Puerto Rico or any other labor organization is certified by the National Labor Relations Board as the exclusive bargaining representative of such employees; or (3) to force or require Vega Otero, Central Roig Refining Company, Antonio Roig Sucrs. S. en C., or any other employer, to assign the work of unloading refined sugar or general cargo from vehicles hauling it to the piers, and stacking it on the piers of San Juan or other ports of Puerto Rico, to employees who are members of or represented by ILA or its affiliates, rather than to employees who are not members of or represented by ILA or its affiliates, unless such employer is failing to conform to an order of the Board determining the bargaining representative of employees performing such work; and

It is further Ordered, Adjudged, and Decreed that

Respondents ILA, Trade Council, and Rodriguez Rojas' Union, and their officers, agents, servants, employees, and attorneys

and respondent E. G. Moreno, and his agents, servants, employees and attorneys, and all persons in active concert or participation with them be and they hereby are *Enjoined* and *Restrained* pending the final adjudication by the National Labor Relations Board of the matters involved in this proceeding from engaging in or by picketing, threats, orders, directions, appeals, requests, instructions, or any other means, or permitting such to remain in effect, inducing or encouraging employees of Antonio Roig Sucrs. S. en C., Central Roig Refining Co., Inc., or of any other employer, to engage in a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport or otherwise handle or work on goods, articles, materials, or commodities, or to perform services, where an object thereof is to force or require Antonio Roig Sucrs. S. en C., or Central Roig Refining Co., Inc. to recognize or bargain with respondent Rodriguez Rojas' Union or Trade Council as the collective bargaining representative of employees of Central El Ejemplo, Humacao, Puerto Rico, as long as Organization of Industrial Workers of Puerto Rico or any other labor organization is certified by the National Labor Relations Board as the exclusive collective bargaining representative of such employees.

Findings of Fact and Conclusions of Law

This case came up for hearing on an order to show cause why a temporary injunction pending final adjudication by the National Labor Relations Board of the matters involved in the verified petition of Salvatore Cosentino, Regional Director of the Twenty-Fourth Region of said Board and on behalf thereof, pursuant to Section 10(*l*) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 160(*l*) should not be granted. Respondents filed a motion for extension of time to answer and to appear and show cause, and plaintiff filed an opposition thereto and in the alternative a motion for a temporary restraining order. Respondents' motion for extension of time was granted, and petitioner's motion for a temporary restraining order, effective until the extended date to appear and show cause was also granted. Respondents thereafter filed an answer in response to the petition, and the hearing was held on the petition and answer. James F. Foley and George L. Weasler, Esqs. appeared for petitioner and Ramon H. Vargas and Hipolito Marcano, Esqs. appeared for all respondents except Union of Industrial Workers of Central El Ejemplo, Humacao, Puerto Rico. On the first day of hearing the temporary restraining order was made effective until the Court's decree in the proceeding was issued and made effective. All the parties were accorded full opportunity to be heard, to examine and cross-examine witnesses, to present evidence bearing on the issues, to argue on the evidence and the law, and to file briefs thereon, at sessions held on July 21, 22, 24, 28 and 30, and on August 1, 4, 5 and 6, 1952. Petitioner in accordance with Rule 15(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., moved to amend the prayer in its petition to conform to the evidence, and such motion has been granted. The Court has fully considered the petition, answer, evidence, briefs and arguments of counsel. Upon the entire record, the Court makes the following:

Findings of Fact

1. Petitioner is Regional Director of the Twenty-Fourth Region of the National Labor Relations Board (herein called the Board).

2. The practices hereinafter found to have been engaged in by respondents and to be unfair labor practices within the meaning of the Act were engaged in by respondents in and about San Juan, Humacao and Punta Santiago, Puerto Rico, within this judicial district.

3. (a) On or about May 28, 1952, Central Roig Refining Company, Inc., filed charges with the Board alleging that among other things, respondents District Council of Ports of Puerto Rico, International Longshoremen's Association, AFL, (herein called ILA,) and its Locals 1740 and 1674, had engaged in, and were engaging in, unfair labor practices within the meaning of Section 8(b) (4) (A) and (4) (D) of the Act.

(b) On or about June 10, 1952, Antonio Roig Sucrs. S. en C., filed with the Board a charge alleging that said respondent ILA and respondents Union of Industrial Workers of Central El Ejemplo, Humacao, Puerto Rico, recently organized by and under the leadership of Juan Rodriguez Rojas, and others, herein called Rodriguez Rojas' Union, and Amalgamated Trade Unions' Council, herein called Trade Council, had engaged in, and were engaging in, conduct in violation of Section 8(b) (4) (C) of the Act.

(c) On or about May 29, 1952, Francisco Vega Otero, (herein called Vega Otero), filed with the Board a charge alleging that respondent ILA and respondent E. G. Moreno, its president, had engaged in, and were engaging in, conduct in violation of Section 8(b) (4) (D) of the Act.

(d) On or about June 17, 1952, Porto Rico Steamship Association (herein called Steamship Association) filed with the Board an amended charge to an original charge filed June 4, 1952, alleging that respondents ILA, E. G. Moreno, and Local 1740 had engaged in, and were engaging in, conduct in violation of Section 8(b) 4 (A) and (4) (D) of the Act.

(e) On or about June 17, 1952, Steamship Association filed with the Board an amended charge to an original charge filed June 10, 1952, alleging that among others, respondents ILA and Locals 1740 and 1674, and their agent E. G. Moreno, had engaged in, and were engaging in, conduct in violation of Section 8(b) (4) (A) of the Act.

4. Respondent E. G. Moreno, herein called Moreno, is president of respondent ILA, and is also the representative in Puerto Rico of the International Longshoremen's Association, AFL. The International Longshoremen's Association, AFL, has its principal office in New York City.

5. Respondents Locals 1740 and 1674 are affiliated with ILA. Local 1740 and Local 1674, unincorporated associations, are organizations which represent employees with respect to wages, hours of work and other working conditions who are employed directly or indirectly in stevedoring and longshoremen's work in and about the port of San Juan, Puerto Rico.

6. ILA is an organization which is comprised of affiliated locals, like 1740 and 1674, that represent employees engaged directly or indirectly in stevedoring and longshoremen's work in all ports of Puerto Rico, with respect to wages, hours of work and other working conditions, and which acts as a central collective bargaining agent on behalf of all such locals.

7. Trade Council is affiliated with International Longshoremen's Association, AFL, and does business with the latter through respondent Moreno, the latter's representative in Puerto Rico. Trade Council is an organization which is comprised of local unions that represent local agricultural and factory workers employed in Puerto Rico with respect to wages, hours of work and other working conditions, and which acts as a central collective bargaining agent on behalf of all such locals.

8. Rodriguez Rojas' union comprised of Juan Rodriguez Rojas, Herminio Lopez Ramirez, Luis Cuadrago Lugo, and Heraclio Espinosa and other persons constituting a minority group of members of the Union Brotherhood of Workers of Central El Ejemplo which represents the workers of Central El Ejemplo, Humacao, Puerto Rico, is illegally representing itself as the Union Brotherhood of Workers of Central El Ejemplo, and has attempted and is attempting illegally to force Antonio Roig Sucrs. S. en C., which operates Central El Ejemplo, to recognize it as the representative of employees of Central El Ejemplo. This dissident minority group has been repudiated by the legally constituted Union Brotherhood of Workers of Central El Ejemplo, and by its parent union, the Organization of Industrial Workers of Puerto Rico. The Organization of Industrial Workers of Puerto Rico has been certified by the Board as the collective bargaining agent for Central El Ejemplo employees, and it and the legally constituted Union Brotherhood of Workers of Central El Ejemplo are the parties on behalf of such employees to a collective bargaining contract with Antonio Roig Sucrs. S. en C.

9. Respondents ILA, Locals 1740 and 1674, Trade Council and Rodriguez Rojas' Union, are labor organizations (within the

meaning of Sections 2(5), 8(b) and 10(*l*) of the Act, 29 U.S.C.A. §§ 152(5), 158(b), 160(*l*)) and having their principal offices within this judicial district. All respondents are engaged within this judicial district in doing business and in protecting the interests of the members of Locals 1740 and 1674 and other locals affiliated with ILA, of members of locals affiliated with Trade Council and of members of Rodriguez Rojas' Union.

10. The Regional Director of the Board, after investigation, concluded that there was reasonable cause to believe, and there is reasonable cause to believe, that respondents engaged in and were engaging in, unfair labor practices tending to impede and disrupt the business operations of Antonio Roig Sucrs. S. en C., Central Roig Refining Company, Vega Otero, Bull Insular Lines Inc. (herein called Bull Lines) and Lykes Lines Agency, Inc. (herein called Lykes Lines), and other employer members of Steamship Association and which, under the evidence here, are found to have consisted of the following:

(a) Antonio Roig Sucrs. S. en C., a partnership, manufactures raw sugar in two plants, Central El Ejemplo, Humacao, and Central Roig, Yabucoa, Puerto Rico. Central Roig Refining Company, Inc., a corporation wholly owned by the partners of Antonio Roig Sucrs. S. en C., manufactures refined sugar at a sugar refining plant in Yabucoa, Puerto Rico. (Both Antonio Roig Sucrs. S. en C., and Central Roig Refining Co., Inc., are hereinafter referred to as one person under the name of "Roig".) Roig ships raw and refined sugar to points outside Puerto Rico by ocean going vessels operated by Bull Lines and Lykes Lines. During 1951, it shipped to points outside Puerto Rico approximately 380,000 bags (100 lbs. each) of refined sugar and approximately 120,000 bags (250 lbs. each) of raw sugar, value in excess of $1,600,000. Roig ships its refined and raw sugar from San Juan. Roig's refined sugar is the only refined sugar shipped from San Juan.

(b) Vega Otero is an independent trucker who, under contract with Roig, hauls and has been hauling for approximately two years, Roig's refined and raw sugar in trucks or truck trailers from Roig's plants in Yabucoa and Humacao to the piers in San Juan operated by Lykes Lines and Bull Lines, or the latter's wholly owned subsidiaries, where it is stacked awaiting shipment on ocean going vessels operated by Bull Lines and Lykes Lines. When Vega Otero delivers Roig's refined sugar to the San Juan piers, it is unloaded from his trucks by his own laborers who accompany the trucks. These employees and his drivers are represented by the Association of Truck Drivers and Helpers of Caguas, affiliated with Association of Drivers of Puerto Rico, TWVA–CIO. The Association of Truck Drivers and Helpers of Caguas was certified by the Board as the exclusive collective bargaining representative of these employees on April 17, 1952. When Vega Otero delivers Roig's raw sugar to the piers, it is unloaded from his trucks and stacked at the piers by members of respondents ILA and Local 1740 who are employed by Lykes Lines or Bull Lines or the latter's wholly owned subsidiaries. These unloading practices for Roig's refined sugar (which for purposes of loading and unloading at the piers is treated the same as general cargo) and for its raw sugar when it is hauled to the piers by trucks or truck trailers, have been the customary unloading practices for such sugar at Bull Lines and Lykes Lines piers in San Juan for the periods 1936 to 1942, and 1946 to date. During the period from 1942 to 1945, which was the period of World War II, members of ILA and Local 1740 for security reasons, unloaded all vehicles that passed through the gates of San Juan piers.

(c) Steamship Association is a member association comprised of steamship companies which operate ocean going vessels that carry exports from and imports to Puerto Rico, and wharfingers and other employers who operate on the Puerto Rican waterfront. Included among its members are Bull Lines, Lykes Lines, Waterman Lines Co. Inc., Pope & Talbot Lines, Puerto Rico Coal Co., and Puerto Rico Dry Dock and Marine Terminal, Inc. Members of Steamship Association, or their wholly owned subsidiaries also operate the piers

and docks in San Juan, and elsewhere in Puerto Rico, at which imports are unloaded from ocean going vessels and exports are loaded onto ocean going vessels. Steamship Association has an association-wide collective bargaining contract with ILA and its affiliated Unions.

(d) (1) Bull Lines and Lykes Lines are engaged in the operation of ocean going vessels on which are carried over 75% of the products exported from Puerto Rico and over 85% of all the cargo imported to Puerto Rico. During 1951 Bull Lines and Lykes Lines carried approximately 432,404 bags of refined sugar from San Juan to ports in continental United States and other world ports. These lines also carried from San Juan to ports in Continental United States and other world ports approximately 81,347 tons of general cargo. During the year 1951, Bull Lines and Lykes Lines vessels carried to San Juan approximately 454,741 tons of imports.

(d) (2) Bull Lines' and Lykes Lines' vessels carry exports from San Juan, Ponce, Mayaguez, Fajardo, Humacao, Arroyo, Jobos, Quanica and Guayanilla, Puerto Rico, and carry imports to the ports of San Juan, Mayaguez and Ponce, Puerto Rico. The loading and unloading of cargo at these ports is performed by stevedores who are members of or represented by ILA and its affiliates.

(d) (3) Raw sugar to be loaded on Bull Lines' and Lykes Lines' vessels is unloaded from the consignors' or independent truckers' vehicles and carried to the place of rest on the piers by employee stevedores of Lykes Lines or Bull Lines, or the latter's wholly owned subsidiaries. These employees are members of locals affiliated with ILA. At San Juan, the employees of Lykes Lines or Bull Lines or the latter's wholly owned subsidiaries who do this work are members of Local 1740. Raw sugar is the only cargo for export unloaded from trucks or trailers to the place of rest on the piers at any Puerto Rican port by employees of Lykes Lines or Bull Lines or the latter's wholly owned subsidiaries. This practice has been in effect for at least the last sixteen years except for the World War II period of 1942 to 1945, when for security reasons members of ILA locals unloaded all cargo from vehicles which had passed through pier gates.

(d) (4) Refined sugar and general cargo to be loaded on Bull Lines' and Lykes Lines' vessels for export are unloaded from the consignors' or truckers' vehicles and carried to the place of rest on the piers operated by Lykes Lines or Bull Lines or the latter's wholly owned subsidiaries by the employees of the consignors or truckers, whichever is hauling the cargo to the piers. Roig's refined sugar is the only refined sugar handled at the San Juan piers operated by Lykes Lines or Bull Lines or the latter's wholly owned subsidiaries. Imports that are at the place of rest at the piers operated by Lykes Lines or Bull Lines or the latter's wholly owned subsidiaries are carried to the consignees' or truckers' vehicles and loaded on such vehicles by the employees of the consignees or truckers as the case may be. These practices for unloading from vehicles refined sugar and general cargo destined for export and for loading imports on vehicles from the place of rest on the piers have been customary practices for at least the last sixteen years, with the exception of the World War II years of 1942 to 1945 when for security reasons as stated above, all loading and unloading was done by members of ILA and affiliated locals. Employees of the consignors, consignees, or truckers who handle the unloading of refined sugar and general cargo for export and the loading of imported cargo are generally not members of or represented by locals affiliated with ILA.

(d) (5) Cargo is loaded on or unloaded from vessels of Bull Lines and Lykes Lines to and from the place of rest at the piers as the case may be by the employees of Lykes Lines and Bull Lines or the latter's wholly owned subsidiaries who are members of or represented by Locals affiliated with ILA. The employees of these companies engaged in this work at the San Juan piers are members of or represented by Local 1740.

(d) (6) Tally clerk employees of Bull Lines and Lykes Lines check all cargo to be loaded on vessels or unloaded from vessels or to be carried from place of rest

at the piers to consignees' or truckers' vehicles. The employees of Bull Lines or its wholly owned subsidiaries who do this work at the San Juan piers are members of the independent union, Union of Dock Workers, and the employees of Lykes Lines who handle this work at the San Juan piers are members of or represented by Local 1674. At other ports in Puerto Rico, the employees of Lykes Lines and Bull Lines or the latter's wholly owned subsidiaries who handle this work are members of or represented by locals affiliated with ILA.

(d) (7) When stevedores are needed to load or unload cargo at the docks operated by Lykes Lines or Bull Lines or the latter's wholly owned subsidiaries, ILA and its applicable locals are notified by Bull Lines or Lykes Lines as the case may be of the pier at which and the time when cargo will be loaded or unloaded. At or about that time ILA and its applicable locals will send men to the designated pier, and these men will gather outside the gate of the pier in a group called a "shape" or "shape-up". A foreman of Lykes Lines or Bull Lines or the latter's wholly owned subsidiaries as the case may be will select men from the "shape" or "shape-up". The men selected for the gangs are each given an identification badge or "chapa" and the gangs then come inside the piers and perform the assigned task of loading or unloading.

(e) (1) The workers of Central El Ejemplo are represented by the Organization of Industrial Workers of Puerto Rico for purposes of collective bargaining with Roig with respect to wages, hours of work and other working conditions. This union is a parent union and has a local at Humacao, the Union Brotherhood of Workers of Central El Ejemplo, which directly represents the workers of Central El Ejemplo. The Board on May 2, 1951, certified the Organization of Industrial Workers of Puerto Rico as collective bargaining representative of Central El Ejemplo employees, and this parent union and its local, Union Brotherhood of Workers of Central El Ejemplo, are parties on behalf of Central El Ejemplo employees to a collective bargaining contract with Roig effective for the period January 1, 1952 to December 31, 1952.

(e) (2) The officers of Union Brotherhood of Workers of Central El Ejemplo are elected annually during the fifteen days ending on July 5. There are 205 members in this union and a quorum for the purpose of holding a meeting of the union is 103. Meetings are called by the president of the local. The legally elected officers of the local are Domingo Rivera, president; Rosendo Rosado, vice-president; Felipe Rivera, secretary; Prim F. Lopez, treasurer; Armando Custodio, marshal; Esteban Marques, financial secretary; Juan Rodriguez Rojas, Patricio Marquez and Lucas Rivera, members of the Board of Directors.

(e) (3) On April 12, 1952, there was held in Humacao, Puerto Rico, a meeting attended by members of the Union Brotherhood of Workers of Central El Ejemplo and others. This meeting was called by one Julio Luzunaris, an employee of Central El Ejemplo and a member of Union Brotherhood of Workers of Central El Ejemplo, and others who held no official positions in this union that would entitle them to call or hold an official union meeting. No legally constituted officers of the Union, except Juan Rodriguez Rojas of the Board of Directors were present at the meeting. Less than a quorum required for the holding of a union meeting was present. The person who presided at the meeting was Wadelmiro Arroyo, ILA organizer. Also present at the meeting was Armando Rivero, president of Trade Council. Arroyo and Rivero were not and are not members of Union Brotherhood of Workers of Central El Ejemplo. They were present at the meeting to induce those present to attempt to affiliate the Union of Brotherhood of Industrial Workers of Central El Ejemplo with Trade Council and to attempt to force the workers of Central El Ejemplo to select Trade Council as their collective bargaining agent.

(e) (4) At the meeting were elected a group of persons alleged to be a slate of officers replacing the legally elected officers of Union Brotherhood of Industrial Workers of Central El Ejemplo. These alleged

officers are: Juan Rodriguez Rojas, president (a legally elected member of the Board of Directors of the Union Brotherhood of Workers of Central El Ejemplo); Herminio Lopez, vice-president; Eugenio Vega, recording secretary; Heraclio Espinoso, treasurer; Ambrosio Vega, marshal; and Julio Luzunaris and Emilio Hernandez, committeemen. Since April 12, 1952, these persons, on behalf of themselves and the other persons present at the meeting of April 12, 1952, have represented themselves as the legally constituted group of officers of Union Brotherhood of Workers of Central El Ejemplo. On April 12, 1952, they requested Roig to recognize them as the duly elected officers of the Brotherhood of Workers of Central El Ejemplo. These alleged officers favor the affiliation of Union Brotherhood of Workers of Central El Ejemplo with Trade Council and disaffiliation from Organization of Industrial Workers of Puerto Rico, and in collective bargaining with Roig the representation of workers of Central El Ejemplo by Trade Council instead of Organization of Industrial Workers of Puerto Rico.

(e) (5) Since April, 15, 1952, the Union Brotherhood of Workers of Central El Ejemplo through its legally constituted officers, and since April 17, 1952, the Organization of Industrial Workers of Central El Ejemplo, have repudiated the April 12, 1952, meeting above described as a meeting of Union Brotherhood of Workers of Central El Ejemplo, and the slate of officers elected at the April 12, 1952 meeting as the legally constituted officers of this local.

(e) (6) On April 18, 1952, Roig notified Juan Rodriguez Rojas and the other officers that it refused to recognize them as the representatives of the Union Brotherhood of Workers of Central El Ejemplo or of the workers of Central El Ejemplo and has continued to refuse them such recognition since that date.

(e) (7) Juan Rodriguez Rojas and the other persons elected at the meeting of April 12, 1952 continue to represent themselves as the representatives of the Union Brotherhood of Workers of Central El Ejemplo and of the workers of Central El Ejemplo, and are supported in this representation by Trade Council and ILA and by the persons attending the meeting of April 12, 1952. This group is herein called Rodriguez Rojas' Union.

(f) On May 6, 1952 Armando Rivero, president of Trade Council, visited Antonio Roig, Jr., at his office in Humacao, and told him that from then on Roig would have to transact union matters with the slate of officers elected at the April 12, 1952 meeting. He threatened Roig, through Antonio Roig, Jr., with trouble at the San Juan piers if it did not recognize Rodriguez Rojas' Union as the representative of Central El Ejemplo employees. He also told Antonio Roig, Jr., that ILA was behind the Trade Council, and that respondent Moreno, among others, was a person the law could not touch. Antonio Roig, Jr., told Rivera that Roig would not transact union matters with the slate of officers elected on April 12, 1952.

(g) On the same date, May 6, 1952, respondents ILA and its Local 1740 picketed the pier of Bull Lines in San Juan at which Roig's refined sugar was being unloaded from Vega Otero's trucks by the latter's employees, and stopped the unloading of the sugar by these employees, claiming that the work belonged to members of ILA and its Local 1740. ILA and Local 1740 ceased this unlawful activity about 1:30 p. m. on May 6th upon instructions from Moreno. Bull Lines, which would have been unable to unload its vessel S. S. Suzanne from New York City at 2:00 p. m. on May 6th, if the ILA picket line was present, persuaded Moreno to cease and to order respondents ILA and Local 1740 to cease the unlawful activity at the Bull Lines piers, and attempt by peaceful means to win from Roig and Vega Otero the concessions they were demanding.

(h) On May 7, 1952 and until May 12, 1952, Rodriguez Rojas' Union conducted a strike at El Ejemplo and together with officials of Trade Council and ILA induced and encouraged Central El Ejemplo employees to engage in a concerted work refusal because of Roig's refusal to recognize Rodriguez Rojas' Union as their collective bargaining representative. Armando Rivero and Ramon Gordils, vice-president of

ILA, stated over a loudspeaker directed to the workers that until the recognition demanded by Rodriguez Rojas' Union was given, not a single bag of Roig's sugar would be shipped. During the strike on May 7th, Roig received a note from Armando Rivero, in which he asked that Roig discuss with him problems that arose at the San Juan piers when Roig's refined sugar was hauled there. Rivero in his note made the statement that "the leaders of the docks are with me." Following Roig's reply to Rivero, in which Roig stated that problems involving the piers at San Juan should be discussed with his attorneys in San Juan, Roig received a note from Rivero, Gordils and Ricardo Catala Diaz, financial secretary of ILA, in which was stated their regret that the problems encountered by Roig at the San Juan piers were not settled.

(i) On May 8, 1952, ILA and Locals 1740 and 1674 established a picket line at the entrance to the pier of Lykes Lines when Roig's refined sugar was being unloaded from Vega Otero's truck trailers by Vega Otero's laborers, and refused to permit the laborers to unload the sugar. One of the 5 Vega Otero vehicles had been unloaded and one was about one half unloaded when the picket line was estalished. The vehicles of Vega Otero had carried to the pier on May 8th, 2000 bags of a 6000 bag shipment of refined sugar destined to be loaded on the SS Brinton Lykes of Lykes Lines. The other 4000 bags had been hauled and unloaded to the pier on May 7th without interference, although on that day about 4:30 p. m. Guillermo Ortiz, treasurer of ILA, informed Alfonso Peña, Assistant General Manager of Lykes Lines that a picket line would be placed at Lykes Lines piers the following day if Lykes Lines continued to receive Roig's refined sugar, and that if the sugar was received at the piers, it would not be loaded aboard vessels for shipment.

(j) When the picket line was established on May 8th, Peña of Lykes Lines asked Jose N. Caban, secretary of ILA, to withdraw the picket line on the same basis that the picket line at Bull Lines' piers was withdrawn on May 6th. Caban agreed and withdrew the picket line, whereupon Vega Otero's vehicles were driven on to the pier on which they were to be unloaded, and were unloaded by Vega Otero's employees, and Lykes Lines employees, members of ILA and Locals 1740 and 1674 who had refused to enter the pier gates because of the picket line, entered the gates and commenced to work.

(k) About an hour later Moreno reestablished the picket line and warned Peña that the shipment of Roig's refined sugar destined for the SS Brinton Lykes would not be loaded on that vessel. But since the trucks were already inside the pier, and the unloading did not require the crossing of the picket line at the entrance to the pier, Vega Otero's laborers unloaded Roig's refined sugar from the trucks. However, on May 10th and 11th, ILA and Locals 1740 and 1674 and Moreno would not permit the employees of Lykes Lines, members of ILA and Locals 1740 and 1674 to load this shipment of Roig's refined sugar on the SS Brinton Lykes as scheduled although these employees were permitted and did load the remaining cargo that this vessel was scheduled to carry. As a result, the vessel sailed without this shipment of Roig's sugar.

(l) On May 17, 1951, Vega Otero hauled 10,000 bags of Roig's refined sugar from Yabucoa to the railroad freight terminal at Pasto Viejo where his laborers loaded the sugar on freight cars. The sugar was then hauled to Punta Santiago by the railroad, and 2000 bags were unloaded from the freight cars and placed in lighters owned and operated by Eastern Sugar Associates by members of the independent Union of Dock and Warehouse Workers of Punta Santiago and members of Local 1717 of ILA, Punta Santiago.

(m) The complete load of sugar was to be loaded on an ocean going vessel of Bull Lines on the afternoon of May 18, 1952 from the lighters. It is necessary to load ocean going vessels from lighters at Punta Santiago as this port lacks adequate docking facilities. Roig had engaged members of the Union of Dock and Warehouse Workers and Local 1717 of ILA, to load the sugar on to the lighters from the rail-

road cars and Bull Lines had engaged members of ILA Local 1584, Punta Santiago, to load the Bull Lines' vessel from the lighters. Roig had also engaged members of the independent Union of Construction, Repair and Maintenance Workers of Punta Santiago to do tally work both in connection with the loading of the lighters and the loading of the Bull Lines' vessel. Bull Lines employed members of ILA Local 1584 to also do tally work in connection with the loading of the Bull Lines' vessel.

(n) On the evening of May 17, 1952, ILA and Moreno induced and encouraged the members of the unions engaged by Roig and Bull Lines neither to load the lighters nor the Bull Lines' vessel on May 18th, and on May 18th informed Roig through a representative of Eastern Sugar Associates, and the president of Local 1717, that he would be willing to talk to him on the afternoon of May 18, 1952. However, since the loading of the Bull Lines' vessel could not be completed in the time between the termination of a meeting with Moreno regardless how successful or unsuccessful and the scheduled time for the vessel's departure at or about 4 p. m. of May 18th, Roig had the 10,000 bags of sugar returned to Pasto Viejo by the railroad, reloaded on Vega Otero's trucks and hauled to its warehouses in Yabucoa where it was stored at the time the petition herein was filed.

(o) On May 21, 1952, Moreno by cable requested International Longshoremen's Association to prevent the unloading of Roig's refined sugar in continental United States, because Roig refused to recognize Rodriguez Rojas' Union as the representative of the employees of Central El Ejemplo. On May 26, 1952, F. Yaeger, District President for the South Atlantic and Gulf Coast District of International Longshoremen's Association, advised Moreno by cable that in answer to the latter's cable of May 21, 1952, International Longshoremen's Association would support 1005 ILA's demands at Central El Ejemplo and upon other members of the sugar industry, and asked Moreno to inform the International Longshoremen's Association of the ships leaving Puerto Rico carrying Roig's refined sugar. On July 16, 1952, Ramon Mejias, Vice-President of ILA, cabled Moreno from New York City that he had followed all of Moreno's instructions, and that Moreno must inform him of the sailings from Puerto Rico of vessels carrying Roig's refined sugar.

(p) On June 2, 1952, Vega Otero's vehicles hauled approximately 2000 bags of Roig's refined sugar to Pier 1 of Bull Lines, and about 8:30 a. m. Vega Otero's laborers who accompanied the trucks proceeded to unload the trucks at the pier. These 2000 bags were the first delivery of 8000 bags to be shipped on the SS Kathryn due to sail on June 5, 1952. Five thousand bags were consigned to the port of New York and 3000 bags to the port of Baltimore.

Two vehicles were unloaded and a second truck was brought on to the pier and was being unloaded when Gordils, Caban, and Ortiz, appeared and asked Vega Otero's men to cease the unloading. When they refused, the three ILA officials told them that they would be forced to leave the piers if they did not leave voluntarily. Vega Otero's men then ceased unloading and left the piers. Stella, who is employed in an executive capacity by Vega Otero then secured police protection for Vega Otero's workers during the unloading, but before the vehicles which were outside the entrance gate to the pier could be driven on to the pier and Vega Otero's workers could enter through the gate, ILA pickets arrived at the entrance gate with picket signs containing thereon the statements:

"All work at the waterfront is jurisdiction of ILA. To stowe sugar is part of our agreement on the docks. We demand that it be complied."

"The work at the dock is for the dock workers. We do not permit imported workers for lower wages than ours".

"The sugar stowers demand the compliance of our contract. To stow sugar on the docks is the jurisdiction of the dock workers."

Vega Otero's workers refused to cross the picket line, and the drivers refused to attempt to drive the trucks across the picket line. Thereupon, Vega Otero's drivers in accordance with his instructions, drove the trucks containing the refined sugar to the Roig warehouses in Yabucoa, where it was stored. At this time Caban told Stella that if Vega Otero did not stop unloading and stacking Roig's refined sugar, ILA and its locals would stop him from hauling raw sugar.

(q) At 10:30 a. m. on June 2nd, shortly before ILA forced Vega Otero's laborers to cease unloading the sugar, Gordils informed Miguel Such, Vice-President of Bull Lines, and Ramon Rodriguez Sanchez, Comptroller of Bull Lines, that ILA was stopping the unloading of refined sugar by the truckers' employees, and asked that Bull Lines remove the partially unloaded vehicle of Vega Otero from the Bull Lines pier. Such refused to order the vehicle removed, stating to Gordils that such action by Bull Lines would be illegal since it was a public carrier. At 12:30 p. m. ILA placed the picket line at the pier which was receiving the Roig sugar from Vega Otero's trucks and maintained it there until on or about 4:30 p. m., when Vega Otero moved the partially unloaded vehicle from the pier and the remaining three trucks from the pier entrance. Because of the picket line at pier 1, ILA stevedores would not begin loading raw sugar on the SS Glencoe at 1 p. m. as scheduled. In order to remove the SS Glencoe from the area affected by the picket line, Bull Lines moved it to its pier 9, but by the time the ship was ready for loading at pier 9 the work day had ended, and the loading was postponed until the following day.

(r) On or about the dates of May 24, June 7, June 21, July 8 and July 19, 1952, ILA and Locals 1740 and 1674 again refused to load Roig's refined sugar from the place of rest at piers of Lykes Lines because Roig refused to submit to their illegal demands that Roig recognize Rodriguez Rojas' Union as collective bargaining representative for Central El Ejemplo employees instead of the organization of Industrial Workers of Puerto Rico certified by the Board as agent therefor, and Vega Otero and Roig refused to assign the work of unloading Roig's refined sugar from Vega Otero's vehicles to the piers of Lykes Lines at San Juan to persons who are members of or represented by ILA and Locals 1740 and 1674 instead of persons who are members of or represented by members of Association of Truck Drivers and Helpers of Caguas, the collective bargaining representative of such employees.

(s) On or about the dates of May 8, 15, 22, 23, 24, June 8, July 10, and July 15, 1952, ILA and Local 1740 also refused to load Roig's refined sugar from the place of rest at piers of Bull Lines or its wholly owned subsidiaries because Roig refused to submit to the illegal demands that Roig recognize Rodriguez Rojas' Union as collective bargaining representative for Central El Ejemplo employees, instead of the Organization of Industrial Workers of Puerto Rico certified by the Board as agent therefor, and Vega Otero and Roig refused to assign the work of unloading Roig's refined sugar from Vega Otero's vehicles to the piers of Bull Lines at San Juan to persons who are members of or represented by ILA and Local 1740 instead of persons who are members of or represented by members of Association of Truck Drivers and Helpers of Caguas, the collective bargaining representative of such employees.

(t) On or about July 1, 1952, ILA and Local 1740 refused to unload at the San Juan piers operated by Bull Lines or its wholly owned subsidiaries raw sugar of Eastern Sugar Associates which had been hauled from the Centrals of this Company at Juncos and Caguas to such piers by Vega Otero because Eastern Sugar Associates refused to capitulate to certain demands made by ILA in the course of collective bargaining negotiations between ILA and Eastern Sugar Associates.

(u) This Court on July 2, 1952 issued a temporary restraining order restraining among other things ILA and Locals 1740 and 1674 from engaging in strikes and inducing and encouraging employees of Lykes Lines, Bull Lines or its wholly

owned subsidiaries, Vega Otero and Roig from engaging in strikes or concerted refusals to interfere with or prevent the unloading of Roig's refined sugar at the San Juan Piers of Lykes Lines or Bull Lines or the latter's wholly owned subsidiaries from Vega Otero's vehicles by the latter's employees and the loading of Roig's refined sugar to ocean going vessels from the places of rest at the San Juan piers of Lykes Lines, Bull Lines or the latter's wholly owned subsidiaries. Although the temporary restraining order was outstanding ILA and its Locals 1740 and 1674 prevented the loading of Roig's refined sugar on dates subsequent to July 2, 1952, as described in the two preceding paragraphs.

(v) Neither Vega Otero, Roig, Lykes Lines, Bull Lines or the latter's wholly owned subsidiaries have any agreements jointly or severally with ILA, Local 1740 or Local 1674 providing for the unloading of Roig's refined sugar from Vega Otero's vehicles at the San Juan piers operated by Lykes Lines, Bull Lines or, the latter's wholly owned subsidiaries by persons who are members of ILA, Local 1740 or 1674. Neither were there any such agreements when ILA, Local 1740 or 1674 first began its illegal interference with such unloading on or about May 6, 1952.

(w) As a result of the refusal of ILA and its affiliated Locals 1740 and 1674 and Moreno to permit Lykes Lines and Bull Lines to load Roig's refined sugar on to its vessels, Lykes Lines on August 1, 1952 had in its pier warehouses 6000 bags of Roig's refined sugar and Bull Lines on July 29, 1952 had in its pier warehouses approximately 20,682 bags of Roig's refined sugar. This refined sugar has an approximated value of $213,456. As a result of respondents' illegal conduct, Roig on July 28, 1952 had in its warehouses at Yabucoa approximately 175,000 bags of refined sugar consigned for export with an approximated value of $1,460,000. In addition to the heavy warehouse expense attendant on this storage, there is also the additional expense resulting from insurance costs and related expense and from Roig's inability to meet contractual commitments with customers abroad. Any extension of this forced storage by the illegal conduct of respondents will increase substantially the irreparable damage already caused to the public by Roig and his trucker Vega Otero and Bull Lines and Lykes Lines.

11. Neither Roig, Vega Otero, Lykes Lines, Bull Lines or the latter's wholly owned subsidiaries are failing to conform to an order or certification of the Board determining the bargaining representative for employees performing the work of unloading refined sugar from vehicles at the piers of San Juan operated by Lykes Lines, Bull Lines or the latter's wholly owned subsidiaries.

12. By the conduct set forth above, respondents have engaged in, and induced and encouraged the employees of Roig, Vega Otero, Lykes Lines, Bull Lines, the latter's wholly owned subsidiaries, and other employers, to engage in, strikes and concerted refusals in the course of their employment to manufacture, process, handle or transport Roig's sugar and the raw sugar of Eastern Sugar Associates, or to perform services for their employers in connection therewith, with objects of (1) forcing or requiring Roig to recognize or bargain with respondent Rodriguez Rojas' Union; or (2) forcing or requiring Vega Otero, Lykes Lines, Bull Lines and the latter's wholly owned subsidiaries, and other members of Steamship Association and other employers, to cease hauling or transporting Roig's refined sugar and the sugar of Eastern Sugar Associates and the products of other manufacturers or processors or distributors with whom respondents may have a dispute; and to cease doing business with Roig and Eastern Sugar Associates and other employers with whom respondents may have a dispute; and (3) forcing or requiring Vega Otero and other employers to assign to members of ILA or its affiliates the work of unloading from their trucks or other vehicles refined sugar and general cargo and stacking it on the piers, which work Vega Otero and other employers have assigned to their own employees who are not members of ILA or its affiliates.

13. By the aforegoing conduct, respondents have engaged in, and but for the re-

straining order of this court would be presently engaging in, violations of Section 8(b) (4) (A), (4) (C) and (4) (D) of the Act, affecting commerce within the meaning of Section 2(6) and (7) of the Act.

14. It may reasonably be anticipated from the acts and conduct of respondents herein above described that respondents will continue and repeat their conduct hereinabove set forth, and engage in and induce and encourage employees of Roig, Vega Otero, Bull Lines, Lykes Lines, other manufacturers, processors, transporters, truckers and other carriers, and other employer members of steamship association and other employers, to engage in, strikes or concerted refusals in the course of their employment to manufacture, process, transport or otherwise handle or work on goods, articles, materials, or commodities, or to perform services in violation of Section 8(b) (4) (A), 4(C) and (4) (D) of the Act. It is therefore essential, appropriate, just and proper for the purpose of effectuating the policies of the Act, and in accordance with the provisions of Section 10(l) thereof, that, pending final adjudication of the Board with respect to these matters, respondents be enjoined and restrained from engaging in or inducing or encouraging employees of Roig, Vega Otero, Bull Lines, its wholly owned subsidiaries, Lykes Lines, or any other employer, by picketing, threats, orders, directions, appeals, requests, instructions, or any other means, or permitting any such to remain in effect, to engage in, a strike or a concerted refusal in the course of their employment to manufacture, process, handle, transport, or otherwise deal in, goods, articles, materials, or commodities, or to perform services, where an object thereof is: (1) to force or require Vega Otero, Bull Lines, Lykes Lines or any other employer, to cease handling, processing, transporting or otherwise dealing in the products of Roig or any other manufacturer or processor or distributor or to cease doing business with Roig or such manufacturer, processor or distributor; or (2) to force or require Roig to recognize or bargain with respondent Rodriguez Rojas' Union, or any other labor organization, as the collective bargaining representative of Roig's employees, as long as Organization of Industrial Workers of Puerto Rico or any other labor organization is the exclusive bargaining representative of such employees pursuant to a certification of the Board; or (3) to force or require Vega Otero or Roig or any other employer to assign the work of unloading refined sugar or general cargo from vehicles hauling it to the piers and of stacking it on the piers of Puerto Rico, or of loading vehicles of consignee or independent truckers with cargo imported to Puerto Rico and resting on the piers of San Juan or other ports of Puerto Rico, to employees who are members of or represented by ILA or its affiliates, rather than to employees who are not members of or represented by ILA or its affiliates, unless such employer is failing to conform to an order of the Board determining the bargaining representative of employees performing such work.

15. The acts and conduct of respondents above set forth, occurring in connection with the operations of Roig, Bull Lines and Lykes Lines, have a close, intimate and substantial relation to trade, traffic and commerce among the several states, and tend to lead, and have led, to labor disputes obstructing commerce and the free flow of commerce.

### Conclusions of Law.

(1) Roig, and Bull Lines, Lykes Lines and other members of the Steamship Association are all engaged in commerce and in activities affecting commerce within the meaning of Section 2(6) and (7) of the Act, Title 29, U.S.C.A. § 152(6, 7).

(2) Respondents including Rodriguez Rojas' Union, but excluding Moreno, are labor organizations within the meaning of Section 2(5), Section 8(b), and Section 10 (l) of the Act, Title 29 U.S.C.A. §§ 152 (5), 158(b), 160(l), and persons within the meaning of Section 2(1) and Section 10(l) of the Act, 29 U.S.C.A. §§ 152(1) and 160(l). Respondent Moreno is an agent of respondent ILA and Locals 1740 and 1674, Trade Council and Rodriguez Rojas' Union, within the meaning of Sections 2 and 8(b) of the Act, Title 29 U.S. C.A. §§ 152 and 158(b).

(3) This Court has jurisdiction of the parties and the subject matter of this proceeding and has power to grant injunctive relief under Section 10(*l*) of the Act, Title 29 U.S.C.A. § 160(*l*).

(4) There is, and petitioner has reasonable cause to believe that by the acts and conduct hereinabove set forth in the Findings of Fact, respondents, and each of them, have engaged in unfair labor practices within the meaning of Section 8(b), 4(A), 4(C) and 4(D) of the Act, Title 29 U.S.C.A. § 158(b) (4) (A), (4) (C) and (4) (D), affecting commerce within the meaning of Section 2(6) and (7) of the Act, Title 29 U.S.C.A. § 152(6) and (7).

(5) To preserve the issues presented for the determination of the Board as provided in the Act, and to avoid irreparable injury to the policy of the Act and to the interest of the public, employees and employers, it is appropriate, just and proper, that, pending final adjudication by the Board of the said issues, respondents, their agents, servants, employees, attorneys and all persons acting in active concert or participation with them be enjoined and restrained in the manner set forth in paragraph 14 of the Findings of Fact, from the commission or continuation of the acts and conduct set forth in the findings of fact above, acts in furtherance or support thereof, and like or related acts or conduct whose commission in the future is likely, or fairly may be anticipated from respondents' acts and conduct in the past.

(6) A temporary injunction shall forthwith issue in accordance herewith.